IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:08cr057-MEF |
| | ) | WO |
| DOUGLAS EUGENE MARTIN, | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This case is before the court on defendant Martin's motion to suppress (Doc. #12). The court heard evidence on the motion on June 16, 2008. For the reasons set out below, the motion is due to be denied.

**Facts**

On October 12, 2007, Deputy Kenneth Harmon of the Chilton County Sheriff's Department was performing "road duties" – that is, answering calls and making traffic stops – on the north end of Chilton County when he stopped a vehicle driven by John Ritter for speeding on Highway 155. On further investigation, Harmon learned that Ritter did not have any identification or (to his best recollection) insurance; his tag was switched (that is, it belonged to a different vehicle); and he had an outstanding warrant for a probation violation from Georgia for escape. Harmon detained Ritter until he could learn whether Georgia wanted to extradite him on the warrant, placed him in the back of his patrol car, and wrote him a speeding ticket and a switched tag ticket. Ritter gave consent to search his truck, and Harmon found two pill bottles, one containing Lortab and one containing methamphetamine, under the passenger's seat. Harmon arrested Ritter for possession of a controlled substance,

impounded the truck, and had it towed to the county jail.

Harmon subsequently conducted an inventory search of the truck. In the back jump seat he found a vehicle tag which belonged to a black Ford F-350 dually pick-up truck that had been reported stolen in Pelham, Alabama the night before. Harmon also found cameras, cell phones, jewelry, computer flat screens, and monitors in the cab of the truck, and numerous cordless tools, saws, and screwdrivers in the truck bed. After he concluded the inventory, Harmon went back on patrol. Thereafter, Ritter confessed to investigator Mike Poe that he had picked the stolen truck up in Pelham at defendant Martin's request, placed it behind Martin's metal storage building, and received a small quantity of methamphetamine from Martin as payment. Poe called Harmon and told him to try to locate the stolen truck on defendant Martin's property and, if he saw it, to seize it.

Harmon, who was familiar with the Martin residence, drove from Highway 31 onto the service road that ran past Martin's home and behind a large metal building and located the Ford F-350 truck there among what he described as "[a] bunch of scrap cars or junk cars." Harmon looked through the front windshield to obtain the VIN number of the truck, which matched the number of the truck that was stolen from Pelham. Harmon called Poe and, while he waited for Poe to arrive, Captain Benson drove onto the service road from a side road (County Road 138) and met Harmon behind the building. Subsequently, Martin arrived and was placed under arrest and transported to the county jail.

Harmon then met with the District Attorney in Chilton County and told her what had transpired. The District Attorney typed search warrant affidavits for Martin's residence and

his business. The latter is a car dealership and auto repair shop located on Highway 31 about three quarters of a mile south of Martin's home. The D.A. and Harmon proceeded to Chilton County Judge Rhonda Hardesty's home, where the judge swore in Harmon as the affiant, reviewed the affidavits, and signed the search warrants. Officers executed the warrants on the following day.

**Discussion**

Defendant has moved the court to suppress all evidence seized from his residence and business, including seven live rounds of Federal Classic .44 magnum ammunition removed from the residence and fifty live rounds of CCI Blazer .40 caliber and two live rounds of Remington .223 caliber ammunition seized from the business. His motion argues several grounds for suppression of the evidence found at the Martin residence: (1) the affidavit in support of the search warrant did not establish probable cause to search, as it was flawed by a number of material omissions, as more fully set out in the motion – e.g., it failed to establish the credibility of the source, to offer corroboration for the information provided, to provide support for conclusory statements that evidence of theft of property or controlled substances would be found at the residence, and to inform the judge that officers entered onto Martin's property and seized his vehicle until a search warrant could be obtained; and (2) the officers' trespass on Martin's property and seizure of his vehicle prior to the issuance of a search warrant rendered the search unlawful. Defendant offers the same arguments for suppression of the evidence seized from his business and, in addition, he maintains that use of the same affidavit to support both the business and residence searches was improper, as

the affidavit did not provide a sufficient legal basis for the search of the business.

<u>Validity of the Warrants</u>

The majority of defendant's claims relate to the sufficiency of the warrant affidavits and, specifically, to the question of whether or not the affidavits established probable cause to search in light of a number of omissions alleged by defendant. The relevant allegations are as follows:

> 2. The search of the defendant's residence was without probable cause or legal basis to believe defendant had committed a felony.
> 3. The search and seizure was based on legally insufficient probable cause, in that there was no information contained in the Affidavit for Search Warrant that provided sufficient legal basis to establish probable cause to search the residence of the defendant.
> 4. The affiant provided no information in the affidavit indicating his source of information had ever been in the Martin residence, or had ever see [sic] car tags, car titles, vin plates, controlled substances or other items that might be used to manufacture any of these items in the Martin residence.
> 5. There is no information contained in the affidavit establishing any credibility of the information given to the affiant by this source.
> 6. The affiant provided no information or basis in his affidavit which corroborated any information provided to him by his source.
> 7. The affiant gave no information to support his conclusory statement that he had "probable cause to believe, and a clear indication to believe" that evidence of theft of property, be [sic] car tags, titles, vin plates, or controlled substances, or items used to manufacture controlled substances would be discovered at Gene Martin's residence or in the out buildings belonging to Gene Martin.
> 8. There is no information in the affidavit indicating that Gene Martin gave Ritter methamphetamine or Lortab while at Martin's residence.
> 9. There is no information in the affidavit which would tend to corroborate that the affiant's source had taken stolen items to Martin in the past, or that he had ever taken anything to Martin at Martin's residence.
> 10. There is no information provided by the affiant in his affidavit or from the source, other than the conclusory statement of the affiant, that "Gene Martin has engaged in any illegal activities" dealing with car tags, car titles, vin plates, car parts, controlled substances, or items used to manufacture

      controlled substances. The affiant provided no information or basis in the affidavit to support this conclusory statement.

      11.    There is no information to support the affiant's conclusory opinion or alleged basis in fact that evidence of the above mentioned crimes would be discovered in Gene Martin's residence or out buildings.

      12.    The affiant stated that law enforcement located a vehicle matching the description of the stolen vehicle at the residence and on the property of Gene Martin.

      13.    The affiant failed to provide the issuing Judge with the information that law enforcement "drove to the Martin residence and entered a gravel driveway that lead to the rear of a metal building", and that " investigators advised [a deputy] to seize the vehicle at that location until a search warrant could be obtained for the property." The issuing Judge was not made aware of this illegal activity by law enforcement when the search warrant was issued.

Motion to Suppress at 2-3.

      Defendants' claims relating to omissions in the affidavits must be evaluated under the standard set out in Franks v. Delaware, 438 U.S. 154 (1978). In Franks, the Court held that if an officer makes a false statement knowingly and intentionally or with reckless disregard for the truth in an affidavit supporting a warrant, the false statement must be disregarded in determining whether the affidavit is sufficient to support a finding of probable cause. Id. at 171-72. The holding in Franks applies to omissions as well. See, e.g., U.S. v. Booker, 131 Fed.Appx. 234, 243, 2005 WL 1123366, 9 n.4 (M.D. Ala. 2005); Mays v. City of Dayton, 134 F.3d 809, 815 (6th Cir. 1998); Stewart v. Donges, 915 F.2d 572, 582 (10th Cir. 1990); United States v. Haimowitz, 706 F.2d 1549, 1556 n. 3 (11th Cir. 1983); West Point-Pepperell, Inc. v. Donovan, 689 F.2d 950, 959 (11th Cir. 1982); Smith v. Deering, 880 F.

Supp. 816, 825 (S.D. Ga. 1994).[1]  The warrant is valid if, absent the misstatements, there remains sufficient content to support a finding of probable cause. Dahl v. Holley, 312 F.3d 1228, 1235 (11th Cir. 2002) (citing Franks, 438 U.S. at 171-72).  Similarly, even if defendants carry their burden to prove by a preponderance of the evidence that the warrant application contains a material omission that was made deliberately or with reckless disregard for the truth, "the court must reform the warrant application by ... including the omissions, and then determine whether the reformed application nonetheless establishes probable cause." West Point-Pepperell, 689 F.2d at 959.

The affidavit offered in support of the search of the residence reads as follows:

> My name is Ken Harmon.  I am a Deputy with the Chilton County Sheriff's Department, State of Alabama and have been so employed for the past approximately 4 years.  I have been in law enforcement for the past 7 years wherein my duties included a myriad of cases, including various violent crimes, theft, drug related cases, and traffic cases."
> Affiant further states that he has reason to believe, probable cause to believe, and a clear indication to believe, that evidence of theft of property (motor vehicle) including car tags, car titles, vin plates and/or illegal possession of controlled substance and any and all items which may be used to manufacture any of the above listed items will be discovered at the residence and/or out buildings within the curtilage of the residence of, Gene Martin located at 26890 Highway 31 North Jemison, Alabama 35085 including but not limited to:  stolen property such as vehicles, car tags, car titles vin plates, car parts from stolen vehicles and illegal drugs.  Directions are as follows: Leaving the Chilton County Courthouse, take a right on to 2nd Ave, then an immediate right onto Highway 31 North traveling approximately 12

---

[1] Some courts have observed that affidavits claimed to have material omissions, while not immune from the Franks inquiry, are much less likely to merit a Franks hearing than are affidavits containing allegedly false statements, since the mere fact that an affiant did not list every conceivable fact or conclusion in his affidavit does not necessarily render the affidavit invalid.  See, e.g., Mays, 134 F.3d at 815; United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990).

to 15 miles to the city of Jemison. Mr. Martin's residence will be a two story brick residence with a gray tile/shingle roof located on the right side. The residence is the first residence on the right after passing the intersection of Highway 31 and Highway 155.

The facts tending to establish the foregoing grounds for the issuance of search warrant as are follows: On the afternoon of October 12, 2007, Deputy Ken Harmon with the Chilton County Sheriff's Department initiated a traffic stop for speeding on a red Chevrolet S-10 pick-up truck. After running the driver's information through communications, Deputy Harmon discovered that the vehicle had a switched tag. The driver of the vehicle was also in possession of controlled substance (lortab and methamphetamine). Deputy Harmon arrested the driver for unlawful possession of controlled substance. The driver of the vehicle was identified as John Ritter. Upon inventory of the vehicle, Deputy Harmon discovered another Alabama car tag which law enforcement confirmed to belong to a stolen vehicle out of Hoover. Law enforcement located a vehicle matching the description of the vehicle stolen from Hoover on the property of Gene Martin.

Mr. Ritter was taken to the Chilton County Jail where he requested to speak to someone with the Sheriff's Department. Investigator's Mike Poe and Shane Lockhart mirandized Mr. Ritter. During his statement, Mr. Ritter had stolen one Ford F-350 truck at the request of Gene Martin. Mr. Martin told Mr. Ritter the description of the vehicle, directions to where it would be located, and best time to retrieve the vehicle. As payment for stealing this vehicle, Martin gave Ritter the methamphetamine and lortab.

Mr. Ritter had previously taken stolen items such as cameras to Mr. Martin and been paid by receiving illegal drugs.

Based on the foregoing, I have probable cause to believe and do believe that Gene Martin has engaged in illegal activities involving various stolen vehicles, car tags, car titles, vin plates, car parts from stolen vehicles and illegal drugs and/or controlled substances and any and all items used to manufacture any of the previously mentioned items. Based upon my training and experience I know that residences can be used as hideouts and/or staging areas. Therefore it is in my opinion that evidence of these crimes will be discovered on or about Gene Martin's residence and/or out buildings contained within the curtilage. I herein request authorization to search for and seize all evidence relating to the crimes of theft of property and possession of controlled and/or illegal substances, and any documents and evidence relating to criminal activity, specifically drug activity and theft of motor vehicles and any containers which could hold the aforesaid items any containers which could hold the aforesaid items related to the commission of this offense will be located at, at 26890 Highway 31 North Jemison, Alabama 35085 either in

the residence, out buildings contained within the curtilage or within vehicles within the curtilage."

See Government's Exhibit 10. The affidavit in support of the warrant for the search of the residence does not differ materially, other than with respect to addresses and directions. See Government's Exhibit 8.

In this case, defendant has failed to meet his burden, as he has not established by a preponderance of the evidence that Harmon made the omissions in question either deliberately, or with reckless disregard for the truth. Defendant's motion does not contain even a conclusory allegation of intentional or reckless omission, and the court heard no evidence to support such an allegation. At most, any omissions in the affidavit were the result of negligence, and it is clear that "[n]egligent misrepresentations or negligent omissions will not undermine the affidavit." West Point-Pepperell, 689 F.2d at 959.[2]

In addition, the court cannot conclude that the alleged omissions were material. Although it is true that Harmon's affidavit did not indicate that Ritter "had ever been in the Martin residence, or had ever seen car tags, car titles, vin plates, controlled substances or other items that might be used to manufacture any of these items in the Martin residence," the judge could fairly infer that such items might be found in the residence, the business, or the curtilage thereof, given Ritter's report that he had stolen a truck at Martin's request, the

---

[2] Harmon did misrepresent in the affidavits that the vehicle found behind Martin's storage building was stolen from Hoover rather than the neighboring city of Pelham. The court finds that this misrepresentation was simply a mistake due, at most, to negligence, and that the misrepresentation was not material. The same is true for any mistake concerning whether Ritter reported payment in methamphetamine and Lortab, or methamphetamine alone.

fact that the stolen vehicle was located on Martin's property and the tag was found in Ritter's car, the fact that Martin ran an auto sales and body shop business, and Ritter's representation that he had been paid for stealing the vehicle with methamphetamine and Lortab. In addition, although the affidavit does not say that Martin gave Ritter methamphetamine or Lortab while at Martin's residence, or that Ritter took stolen items to Martin at his residence, it did indicate that law enforcement located the stolen vehicle on Martin's property, and that Martin paid Ritter for stealing the vehicle with drugs. Thus, the inference that Ritter may have received such a payment at Martin's residence – or, at least, that Martin might maintain drugs at the residence or his business for this purpose – was, again, a reasonable inference. It was also reasonable for the judge to infer that car tags, car titles, and VIN plates might be associated with car theft and, thus, might be found in a search of Martin's business or residence.³

In addition, "even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11th Cir. 1997); see also Dahl, 312 F.3d at 1235 (Warrant valid if sufficient to support a finding of probable cause absent the misstatements).

---

³ Defendant also complains that "[t}he affiant failed to provide the issuing Judge with the information that law enforcement 'drove to the Martin residence and entered a gravel driveway that lead to the rear of a metal building', and that 'investigators advised [a deputy] to seize the vehicle at that location until a search warrant could be obtained for the property.'" The issuing Judge was not made aware of this illegal activity by law enforcement when the search warrant was issued." Motion to Suppress at 3. For the reasons set out below, the court concludes that this activity was not illegal. Further, the omission was not material and, if this information had been provided, it would not have changed the probable cause determination.

In this case, the court does not find that inclusion of any of the information that defendant contends should have been added by the affiant would have altered the finding of probable cause.

To the extent that defendant intends to argue that Harmon was required to provide additional information that he could *not*, in fact, provide in order to establish probable cause, rather than that he omitted information that was available but intentionally or recklessly withheld, his claim also fails. The Supreme Court has rejected the application of rigid requirements that any particular information must be provided to establish probable cause. "[T]he central teaching of our decisions bearing on the probable cause standard is that it is a "practical, nontechnical conception."... "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Illinois v. Gates, 462 U.S. 213, 231 (1983). What is "critical to a showing of probable cause [is] that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002). The affidavit in this case, "if read in a commonsense way rather than technically, shows ample facts to establish probable cause and allow the [judge] to issue the search warrant." U.S. v. Ventresca, 380 U.S. 102, 109 (1965). As noted above, the mere fact that an affiant does not list every conceivable fact or conclusion in his affidavit does not necessarily render the affidavit invalid. Mays, 134 F.3d at 815.

Finally, to the extent that defendant alleges that the affidavit does not establish the credibility of the informant or the information that he provided, the court analyzes such contentions in accordance with Illinois v. Gates, *supra*. The Supreme Court in that case set out a totality of the circumstances test for assessing whether or not probable cause supports a warrant in circumstances in which an informant gives information. The Court indicated that "this totality-of-the-circumstances approach is far more consistent with our prior treatment of probable cause than is any rigid demand that specific 'tests' be satisfied by every informant's tip." Id. at 230-231 (citations and footnote omitted). The Court noted that

> an informant's "veracity," "reliability" and "basis of knowledge" are all highly relevant in determining the value of his report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case, which the opinion of the Supreme Court of Illinois would imply. Rather, as detailed below, they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place.

Id. at 230 (footnote omitted).

In this case, Ritter, the informant, was a reasonably reliable source of information concerning the events that he related. He was not an anonymous tipster, or even a confidential source, but instead a known potential co-defendant who participated in allegedly illegal activity, made a statement incriminating himself, and agreed to cooperate. Cf. Craig v. Singletary, 127 F.3d 1030, 1045 (11th Cir. 1997) (Statements by co-defendant who has incriminated himself are "reasonably trustworthy information."). Ritter described the alleged

wrongdoing specifically, and it is clear that he had firsthand knowledge. See Gates, 462 U.S. at 234 ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case."). Further, officers were able to corroborate his statement prior to seeking the search warrant by finding the allegedly stolen vehicle where Ritter said it could be located. Under the totality of the circumstances, the judge was justified in relying on the reliability of the informant. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 238. A judge need have no more than a "substantial basis" for concluding that probable cause exists, and courts must give great deference to the [] judge's assessment of the facts presented to him or her. United States v. Moody, 977 F.2d 1425, 1431 (11th Cir. 1992).

Open Field Exception

      Defendant contends that the officers trespassed on Martin's property and illegally seized a vehicle there prior to the issuance of a search warrant, and that this illegal search and seizure rendered the subsequent search of his home and business unlawful. The court cannot agree.

      It is well-established that

      [t]he private property immediately adjacent to a home is entitled to the same

> protection against unreasonable search and seizure as the home itself. *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). At common law, the curtilage is the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life,' ... and therefore has been considered part of the home itself for Fourth Amendment purposes." *Id.* (internal citation omitted).
> 
> The Court reaffirmed this position in *United States v. Dunn,* 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), stating that "[in *Oliver*] we recognized that the Fourth Amendment protects the curtilage of a house."

United States v. Taylor, 458 F.3d 1201, 1206 (11th Cir. 2006).

However, "[t]he law of trespass forbids intrusions onto land that the Fourth Amendment would not proscribe." United States v. Hall, 47 F.3d 1091, 1095-1096 (11th Cir.1995) (citing Oliver v. United States, 466 U.S. 170, 183 (1984); see also Hall, 47 F. 3d at 1096 ("[T]he Supreme Court has long since uncoupled the application of the Fourth Amendment's protections from the common law doctrine of trespass. The Fourth Amendment's reach does not turn upon the mere presence or absence of physical intrusion into an enclosure."). As the Eleventh Circuit has noted, the Supreme Court has "recognized that 'the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself.'" Id. (citation omitted). "Thus, although the private property immediately adjacent to a home is treated as the home itself, this area is not unlimited. It is limited to that property that the individual should reasonably expect to be treated as the home itself." Id. (citation omitted).

The area outside the curtilage is sometimes designated as the open field. "[O]pen fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance. There is no societal interest in

protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be. It is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields in rural areas." Oliver, 466 U.S. at 179. Open fields are not limited to agricultural areas. "[T]he term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech. For example, ... a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment." Id. at 180 n.11.

>Thus, according to the Court,

>>curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. ...We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a "correct" answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration-whether the area in question is so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.

United States v. Dunn, 480 U.S. 294, 301 (1987); see also United States. v. Hatch, 931 F.2d 1478, 1480 (11th Cir. 1991). The central component of this inquiry is whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life.

The area in question in this case consists of a large brick home on a corner where a paved road (Highway 31) intersects a dirt road (County Road 138). The home faces the paved road, and it can be approached from that road by way of two driveways, one on either side of the house. A fenced pool sits directly behind the house. Next to the driveway to the right as one faces the house is a separate entrance onto a gravel service road. That road runs perpendicular to the paved road, between the driveway to the house on one side and a large field of peach trees on the other side. The service road divides after it passes the swimming pool area; the first turn-off (to the left as one faces the house) runs behind the pool and in front of a large metal storage building; the second turn-off (to the right) crosses the peach field. The service road continues and curves to the left between the rear of the metal storage building and an open field until it intersects the dirt road on the left side of the property. The stolen vehicle was found in this location, between the rear of the metal storage building and the open field.

According to Harmon, the service road entrance is approximately seventy-five yards from the house, and the front of the metal building is about one hundred yards from the rear of Martin's residence. Thus, the building is a considerable distance from the residence itself. However, part of the storage building is also occasionally used as a residence, with a bathroom, game room, sofas, large screen TVs, and slot machines adjacent to the pool. In contrast, the rear of the metal building, where the stolen vehicle was found, does not include any doors or windows and faces the open field rather than the pool. It appeared to Harmon that the area where the stolen vehicle was found, to the rear of the metal building, was being

used to store vehicles – not for personal use, but as part of Martin's business.[4] Indeed, defendant's exhibits 1-2, which are enlarged photographs of the area, show multiple vehicles parked behind the metal building on both sides of the service road, and the turn-off through the peach field leads directly to one of Martin's car lots, as is clearly apparent on Defendant's Exhibit 5. Harmon testified that half of the vehicles behind the storage building looked like they had been there a while; the other half looked more recent. The stolen vehicle was about 150-200 yards from the back of the residence, according to Harmon, and in the third row of vehicles behind the metal building, maybe 30-36 feet from the building.

No apparent steps were taken by Martin to protect the area from the observation of people passing by. The storage building is visible from the roadway, and it is painted, on the side facing County Road 138, with a sign that advertises Martin Auto Sales and Peach Farm. Government's Ex. 12. Parked vehicles are apparent down the service road behind the metal building, as viewed from the vantage point of County Road 138, and there is no obstruction present at the entrance to the road such as a gate or chain, other than small peach trees or brush nearby. See Government's Ex. 13. The metal building is not included in any enclosure surrounding the home, and there is no fence around it. Neither the building nor the service road is posted with signs saying do not enter or no trespassing, and there is no evidence of residential use in that area such as patio furniture or a barbecue grill.

---

[4] "[T]he Government has 'greater latitude to conduct warrantless inspections of commercial property' because 'the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home.'" Dow Chemical Co. v. United States, 476 U.S. 227, 237-238 (1986).

Under these circumstances, the court concludes that the open area behind the rear of the metal storage building where the stolen vehicle was located must be considered an open field for Fourth Amendment purposes. The business and agricultural activities carried on in that location were not connected with the intimate activities of the home. Any expectation of privacy defendant may have had in this area was not reasonable. "[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home. Oliver, 466 U.S. at 178; see also United States v. Taylor, 458 F.3d 1201, 1207 (11th Cir. 2006).

Good Faith Exception

The government contends that the officers executing the search warrants relied on the warrants in good faith, even if those warrants were somehow deficient. In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court carved out a good faith exception to the exclusionary rule, holding that the rule does not apply to evidence seized by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate that is subsequently found to be invalid. The focus of the inquiry is "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." Id. at 923 n. 23.

"The Leon good faith exception applies in all but four limited sets of circumstances...: (1) where 'the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth'; (2) 'where the issuing magistrate wholly abandoned his

17

judicial role ...'; (3) where the affidavit supporting the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; and (4) where, depending upon the circumstances of the particular case, a warrant is 'so facially deficient--i.e., in failing to particularize the place to be searched or the things to be seized-- that the executing officers cannot reasonably presume it to be valid.'" United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002) (citations omitted). None of these circumstances is present in this case. Here, it is clear that the officers believed everything in the warrant affidavits to be true, and acted in objectively reasonable reliance on the warrants to search the buildings in question.

## Conclusion

Accordingly, for the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that the motion to suppress (Doc. # 12) be DENIED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before September 5, 2008. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the

Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 25th day of August, 2008.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE